# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| QOMPLX LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>PALO ALTO NETWORKS, INC.,<br><br>    Defendant. | Civil Action No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiff QOMPLX LLC ("Plaintiff" or "Qomplx"), by its undersigned counsel, brings this Complaint against Defendant Palo Alto Networks, Inc. ("Defendant" or "PAN"), for infringement of U.S. Patent Nos. 12,143,424 ("the '424 Patent," Ex. 1); 12,143,425 ("the '425 Patent," Ex. 2); 12,301,627 ("the '627 Patent," Ex. 3); and 11,539,663 ("the '663 Patent," Ex. 4) (collectively, the "Asserted Patents").

## THE PARTIES

2. Plaintiff Qomplx is a corporation organized and existing under the laws of the State of New York, having a principal place of business at 1900 Reston Metro Plaza, Ste 600, Reston, Virginia 20190. Qomplx is a leading innovator with a focus on cybersecurity, analytics, simulation, and AI.

3. Qomplx is the assignee of and owns all right and title to the Asserted Patents.

4. On information and belief, PAN is a corporation organized under the laws of the State of Delaware, with a regular and established place of business in this District at 3901 Dallas Parkway, Plano, Texas 75093. Defendant's Registered Agent for service of process in

Texas is Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701. PAN does business throughout the United States, including in this District.

**JURISDICTION AND VENUE**

5.      The Court has subject matter jurisdiction under 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, et seq.).

6.      PAN is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

7.      This Court has personal jurisdiction over PAN because it has substantial, systematic, and continuous contacts with this District. PAN has a regular and established place of business in the State of Texas and in the Eastern District of Texas, including at 3901 Dallas Parkway, Plano, TX 75093. PAN has committed acts of patent infringement and, as detailed below, contributed to and/or induced acts of patent infringement by others in this District. PAN is registered to do business in Texas and maintains an agent authorized to receive service of process within Texas.

8.      Venue is proper in the Eastern District of Texas pursuant to 28 U.S.C. §§ 1391 and 1400(b) because PAN maintains one or more regular and established places of business in this District and has committed acts of infringement within this District giving rise to this action.

9.      PAN has committed acts of infringement in this District and does business in this District, including making sales and/or providing service and support for customers and/or end-users in this District. On information and belief, PAN purposefully and voluntarily sold one or more infringing products with the expectation they would be purchased in this District, and these infringing products have been and continue to be purchased in this District. Thus,

PAN has committed acts of infringement within the United States, the State of Texas, and this District.



10.     The City of Plano reports that PAN is one of the top 25 "leading employers" in Plano, currently employing over 800 people in this District.[1] On information and belief, multiple of these employees have direct personal knowledge about the accused products and PAN's infringing activities. PAN currently lists 20 open positions in Plano, Texas, including positions related to Accused Products such as Prisma Cloud and XSIAM.[2]

11.     On information and belief, multiple of PAN's product offerings are located in Texas, including Advanced URL Filtering and Cloud NGFW for Azure.[3]

12.     Qomplx's causes of action arise directly from PAN's business contacts and other activities in the State of Texas and this District.

---

[1] https://content.civicplus.com/api/assets/58356543-0b06-4005-b7b4-464e6e000d80?cache=1800

[2] https://jobs.paloaltonetworks.com/en/location/%E3%83%86%E3%82%AD%E3%82%B5%E3%82%B9%E5%B7%9E-jobs/47263/6252001-4736286/3

[3] https://web.archive.org/web/20241127012739/https://www.paloaltonetworks.com/products/regional-cloud-locations

13.    PAN has also derived substantial revenues from its infringing acts within the State of Texas and this judicial district.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 12,143,424

14.    Qomplx repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further alleges:

15.    The '424 Patent, entitled "Rapid Predictive Analysis of Very Large Data Sets Using the Distributed Computational Graph," was duly and lawfully issued on November 12, 2024 and assigned to QOMPLX LLC. A true and correct copy of the '424 Patent is attached hereto as Exhibit 1.

16.    The '424 Patent names Jason Crabtree and Andrew Sellers as inventors.

17.    The '424 Patent claims priority to, among others, U.S. Application No. 14/925,974, filed October 28, 2015.

18.    The '424 Patent has been in full force and effect since its issuance. Qomplx owns all rights to the '424 Patent that are necessary to bring this action.

19.    The '424 Patent, among other things, states that it "is in the field of analysis of very large data sets using distributed computational graph tools which allow for transformation of data through both linear and non-linear transformation pipelines." **Ex. 1** at 3:32-35.

20.    As the '424 Patent explains, "[c]omputer database technology ha[d] allowed [a substantial amount of] information to be reliably stored for future retrieval and analysis," but the prior art did "not have the tools to analyze all but a trickle into knowledge or informed action." *Id.* at 3:61-4:20. Data retrieval and analysis methods had "proven to be too labor

intensive and rigid to be of use in all but the more superficial and simple of campaigns." *Id.* at 4:11-4:18.

21.    The '424 Patent further explains that "[d]ata pipelines, which are a progression of functions which each perform some action or transformation on a data stream, offer a mechanism to process quantities of data" in very large volumes. *Id.* at 4:31-34.

22.    At the time of the invention, however, data pipelines were "extremely limited in what they d[id]." *Id.* at 4:34-35. For example, they could only perform limited tasks such as "move data from a web based merchant site to a distributed data store;" "extract all purchases and classify by product type and region;" and "store the result logs." *Id.* at 4:36-38. Or the data pipelines were "rigidly programmed and possibly required the uses of highly specific remote protocol calls to perform needed tasks." *Id.* at 4:39-40.

23.    The '424 Patent overcomes the technological limitations of the prior art by proposing "a system for rapid predictive analysis of very large data sets using a distributed computational graph." *Id.* at 4:58-63.

24.    Prior to the inventions claimed in the '424 Patent, data pipelines were extremely limited in the tasks that they could perform or were rigidly programmed. The distinct orchestration environment claimed in the '424 Patent provides a tangible improvement to computer technology by allowing substantially larger data sets to be analyzed in a timely and efficient manner. By enlisting additional computer systems and reconfiguring processing tasks on an as-needed basis, claimed embodiments can "introduce new transformation pipelines just as they are needed, creating only those that are ready to compute." *Id.* at 9:40-41. This architecture creates improvements to the functioning of computer systems utilizing the invention.

25.     For example, claimed embodiments in the '424 Patent allows the system to "introduce new transformation pipelines just as they are needed, creating only those that are ready to compute" in order to compensate for the "exponential growth of resource consumption" that may arise in streaming data systems. *Id.* at 9:35-44. This enables the system to operate "in a timely and efficient manner" by providing "the ability to monitor for both operational issues within its components," "to learn and react to intermediate determinations of the analyses it runs," and "self-modify to maintain optimal operation." *Id.* at 4:49-54.

26.     The claims of the '424 Patent thus cover specific solutions that provide specific technological advantages to data processing systems. For example, they claim unconventional distributed architectures that enable smart scaling, which closely matches resource usage to resource needs even with unpredictable streaming data inputs, making the overall system more efficient. They allow the system to scale both up and down dynamically, an inherently difficult problem. For example, scaling down is a significant challenge due to the need to handle data processing that is "in flight" during the rescaling. The result is that these solutions can run in environments that periodically generate massive traffic, reducing average latency to acceptable limits. Those same systems can also scale down to smaller run-time environments, reducing total compute utilization. In the cloud era, this reduced utilization leads to directly reduced cost. Moreover, and as the specification explains, such streaming input feeds can include a wide variety of sources, including for example "the internet," "arrays of physical sensors," "database servers," "electronic monitoring equipment," and "direct human interaction." *Id.* at 15:35-40. As the processing of such streaming data can be "limited" by "the resources of the system," *id.* at 9:64-67, the scaling capabilities recited in the claims provide discrete and tangible improvements to data processing architectures by allowing the

architecture to automatically enlist additional computing resources on an as-needed basis, distributing the increased compute load over multiple computer systems when necessary.

27.     As another example, the claimed distributed computational graph combines knowledge of the network architecture and data flow in a unique way that enables the system to be more adaptable, by, for example, replicating certain processing steps to remove bottlenecks in overall processing time. As another example, the specification explains that the claimed distributed computational graph allows the system to "monitor for data searches or transformations that are processing slowly or may have hung and for results that are outside established data stability boundaries so that actions can be implemented to resolve the issue," enabling both "autonomous[ ]" action by the system itself and "status updates . . . made by administrators" or "direct changes to operational parameters by such." *Id.* at 16:53-61. This leads to improvements in the distribution of response latencies, both reducing average and worst-case latencies.

28.     Accordingly, the claims of the '424 Patent provide discrete technological solutions to challenges unique to computer systems, such as the necessity of dynamic and efficient resource allocation in a data processing environment that requires analysis of streaming data from a variety of potentially disparate input sources.

29.     The '424 Patent's improvements to very large data analysis systems are further described in the specification.

30.     PAN is not currently licensed to practice the '424 Patent.

31.     Qomplx is informed and believes, and thereon alleges, that PAN has infringed and continues to infringe one or more claims of the '424 Patent in violation of 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, directing an entity to use, selling, and/or offering for sale in the United States, and/or importing into the

United States, without authorization, PAN products that practice one of more claims of the '424 Patent, including without limitation products that incorporate, rely upon, interact with, or otherwise utilize Strata Logging Service, formerly known as Cortex Data Lake ("SLS" or the "Accused '424 Functionality").

32.     For example and without limitation, products that incorporate, rely upon, interact with, or otherwise utilize SLS, including at least PAN's AIOps for NGFW, Prisma Access, IoT Security, Panorama, Saas Security Inline, Cortex XDR, Cortex XSOAR, and Cortex Xpanse (collectively, the "Accused SLS Products") embody every limitation of at least claim 1 of the '424 Patent, both literally and under the doctrine of equivalents, as set forth below.

33.     Claim 1 of the '424 Patent provides:

A distributed computing cluster comprising:
a first plurality of computer systems,
    wherein each respective computer system of the first plurality of computer systems comprises a memory that stores a respective first data,
    wherein the respective first data represents a respective portion of a distributed computational graph
   and wherein the distributed computational graph describes a flow of output data of a first transformation pipeline to an input of a second transformation pipeline,
wherein a first computer system of the first plurality of computer systems is configured to:
    receive a first stream of input data from a first input feed,
    process the first stream of input data substantially in real time by executing software instructions that apply the first transformation pipeline to the first stream of input data to generate first pipeline output messages,
    process the respective first data stored in the memory of the first computer system to determine information about the second transformation pipeline,
    and transmit the first pipeline output messages to a second computer system of the first plurality of computer systems in accordance with the determined information,
wherein the second computer system is configured to:
    receive the first pipeline output messages,
    and process the first pipeline output messages substantially in real time by executing software instructions that apply the second transformation pipeline to the first pipeline output messages to generate second pipeline output messages,
wherein the first and second computer systems are distinct; and
a second plurality of computer systems;

wherein a third computer system of the first plurality of computer systems is configured to execute software instructions that cause a fourth computer system of the second plurality of computer systems to execute software instructions that apply at least one of the first transformation pipeline and the second transformation pipeline.

34.    By incorporating, relying upon, interacting with, or otherwise utilizing the Accused '424 Functionality, the Accused SLS Products meet every element of this claim. The further descriptions below, which are based on analysis of publicly available information, are preliminary examples and non-limiting.

35.    For example, and to the extent that the preamble is limiting, the Accused SLS Products form a distributed computing cluster. The data processing infrastructure of Palo Alto Networks products run on a "large-scale data platform" on Google's massive distributed computing cluster.[4]

## The importance of self-managed streaming Infrastructure

We built a large-scale data platform on Google Cloud. We used Dataflow as a managed streaming service. With Dataflow, we used the streaming engine running our application using Apache Beam and observability tools such as Cloud Logging and Cloud Monitoring. For more details, see [1]. The system can handle 15 million of events per second and one trillion events daily, at four petabytes of data volume daily. We run about 30,000 Dataflow jobs. Each job can have one or hundreds of workers, depending on the customer's event throughputs.

36.    On information and belief, the Accused SLS Products comprise a first plurality of computer systems, and each respective computer system of a first plurality of computer systems of the Accused SLS Products comprises a memory that stores a respective first data, which represents a portion of a distributed computational graph. The distributed computational graph describes a flow of output data from a first transformation pipeline to an input of a second transformation. For example, SLS "us[es]" Apache Beam ("Beam") to

---

[4] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

define and deploy pipelines into a distributed environment.[5] Beam itself uses a directed graph to define the structure and execution of operations.[6]

## Pipeline

A Beam pipeline is a graph (specifically, a directed acyclic graph) of all the data and computations in your data processing task. This includes reading input data, transforming that data, and writing output data. A pipeline is constructed by a user in their SDK of choice. Then, the pipeline makes its way to the runner either through the SDK directly or through the Runner API's RPC interface. For example, this diagram shows a branching pipeline:



37.    Documentation shows tens of CPUs required for just a single example customer.[7] The cluster required to serve all of PAN's customers is much larger.



38.    On information and belief, a computer system of the first plurality of computer systems of the Accused SLS Products is configured to receive a stream of input data from an input feed, process the stream of input data substantially in real time by executing software

---

[5] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[6] https://beam.apache.org/documentation/basics/#pipeline

[7] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

instructions that apply the first transformation pipeline to the stream of input data to generate first pipeline output messages, process the respective first data to determine information about the second transformation pipeline, and transmit the first pipeline output messages to a second computer system of the first plurality of computer systems of the Accused SLS Products in accordance with the determined information. On information and belief, a second computer system of the first plurality of computer systems of the Accused SLS Products is configured to receive the first pipeline output messages, process those messages substantially in real time by applying the second transformation pipeline to the first pipeline output messages and generating second pipeline output messages. For example, SLS uses a custom, distributed Beam Runner that receives a stream of input data and processes that data substantially in real time, including by running various complex Beam pipelines.[8] Apache documentation explains that "[a] Beam Runner runs a Beam pipeline on a specific (often distributed) data processing system."[9]

39.    The Beam platform documentation shows the flow of these pipeline input and output messages through transformation pipelines:[10]

---

[8] https://beam.apache.org/case-studies/paloalto/#background

[9] https://beam.apache.org/documentation/

[10] https://beam.apache.org/documentation/

In this diagram, the boxes represent the parallel computations called _PTransforms_ and the arrows with the circles represent the data (in the form of _PCollections_) that flows between the transforms. The data might be bounded, stored, data sets, or the data might also be unbounded streams of data. In Beam, most transforms apply equally to bounded and unbounded data.

You can express almost any computation that you can think of as a graph as a Beam pipeline. A Beam driver program typically starts by creating a `Pipeline` object, and then uses that object as the basis for creating the pipeline's data sets and its transforms.

40.    For example, the various PTransform steps receive pipeline messages, apply transformation pipelines, and send pipeline messages. PAN's Beam Runner, as discussed above, runs these pipelines across massive computational clusters.

41.    On information and belief, a third computer system of the first plurality of computer systems of the Accused SLS Products is configured to cause a fourth computer system of the second plurality of computer systems of the Accused SLS Products to apply at least one of the transformation pipelines. For example, SLS uses a custom autoscaler that watches various metrics, including Beam backlog metrics.[11] The custom autoscaler scales resources up and down on an as-needed basis. When necessary, it scales up the number of task managers to "drain the lag and keep up with the throughput."[12] And when necessary, it "scales down the minimum number of resources required to process the incoming traffic to reduce costs."[13]

---

[11] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[12] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[13] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

42.    Accordingly, as illustrated above, the Accused SLS Products directly infringe one or more claims of the '424 Patent. PAN makes, uses, sells, offers for sale, and/or imports, in this District and/or elsewhere in the United States the Accused SLS Products and thus directly infringes the '424 Patent.

43.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '424 Patent, as provided in 35 U.S.C. § 271(b), including at least by inducing infringement by others, such as PAN's customers and end-users, in this District and elsewhere in the United States, to use the Accused SLS Products in manners that infringe the '424 Patent. PAN induces such direct infringement through its affirmative acts of making, using, directing an entity to use, selling, offering to sell, and/or importing the Accused SLS Products, as well as by advertising the Accused SLS Products and providing instructions, documentation, and other information to its customers and end-users to encourage and teach them how to use the infringing Accused SLS Products, including but not limited to by PAN providing in-store and online technical support, marketing materials, product manuals, advertisements, and other product documentation. At least as of service of this Complaint, PAN performs these affirmative acts with knowledge of the '424 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '424 Patent.

44.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '424 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as PAN's customers and end-users, in this District and elsewhere in the United States. PAN's affirmative acts of selling and offering to sell the Accused SLS Products in this District and elsewhere in the United States, and causing the Accused SLS Products to be manufactured,

used, sold, and offered for sale, contribute to PAN's customers and end-users using the Accused SLS Products, such that the '424 Patent is directly infringed. The accused components in the Accused SLS Products are material to the inventions claimed in the '424 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by PAN to be especially made or adapted for use in the infringement of the '424 Patent during at least the post-service period. Similarly, at least as of service of this Complaint, PAN performs these affirmative acts with knowledge of the '424 Patent and with the intent, or willful blindness, that they cause direct infringement of the '424 Patent.

45.    On information and belief, no licensed patent-practicing commercial products have been made, sold, offered for sale, or imported in a manner that would trigger the requirements of 35 U.S.C. § 287.

46.    PAN's infringement of the '424 Patent has damaged and will continue to damage Qomplx.

47.    Upon service of this complaint, PAN will have explicit written notice of its infringement of the '424 Patent. Nevertheless, on information and belief, PAN will, without authorization, knowingly, intentionally, purposefully, and deliberately continue to infringe the '424 Patent.

<u>**COUNT II**</u>

<u>**INFRINGEMENT OF U.S. PATENT NO. 12,143,425**</u>

48.    Qomplx repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further alleges:

49.    The '425 Patent, entitled "Rapid Predictive Analysis of Very Large Data Sets Using the Distributed Computational Graph," was duly and lawfully issued on November 12,

2024 and assigned to QOMPLX LLC. A true and correct copy of the '425 Patent is attached hereto as Exhibit 2.

50.     The '425 Patent names Jason Crabtree and Andrew Sellers as inventors.

51.     The '425 Patent claims priority to, among others, U.S. Application No. 14/925,974, filed October 28, 2015.

52.     The '425 Patent has been in full force and effect since its issuance. Qomplx owns all rights to the '425 Patent that are necessary to bring this action.

53.     The '425 Patent, among other things, states that it "is in the field of analysis of very large data sets using distributed computational graph tools which allow for transformation of data through both linear and non-linear transformation pipelines." **Ex. 2** at 3:32-35.

54.     As the '425 Patent explains, "[c]omputer database technology ha[d] allowed [a substantial amount of] information to be reliably stored for future retrieval and analysis," but the prior art did "not have the tools to analyze all but a trickle into knowledge or informed action." *Id.* at 3:61-4:20. Data retrieval and analysis methods had "proven to be too labor intensive and rigid to be of use in all but the more superficial and simple of campaigns." *Id.* at 4:11-4:18.

55.     The '425 Patent further explains that "[d]ata pipelines, which are a progression of functions which each perform some action or transformation on a data stream, offer a mechanism to process quantities of data" in very large volumes. *Id.* at 4:31-34.

56.     At the time of the invention, however, data pipelines were "extremely limited in what they d[id]." *Id.* at 4:34-35. For example, they could only perform limited tasks such as "move data from a web based merchant site to a distributed data store;" "extract all purchases and classify by product type and region;" and "store the result logs." *Id.* at 4:36-38.

Or the data pipelines were "rigidly programmed and possibly required the uses of highly specific remote protocol calls to perform needed tasks." *Id.* at 4:39-40.

57.     The '425 Patent overcomes the technological limitations of the prior art by proposing "a system for rapid predictive analysis of very large data sets using a distributed computational graph." *Id.* at 4:58-63.

58.     Prior to the inventions claimed in the '425 Patent, data pipelines were extremely limited in the tasks that they could perform or were rigidly programmed. The distinct orchestration environment claimed in the '425 Patent provides a tangible improvement to computer technology by allowing substantially larger data sets to be analyzed in a timely and efficient manner. By enlisting additional computer systems and reconfiguring processing tasks on an as-needed basis, claimed embodiments can "introduce new transformation pipelines just as they are needed, creating only those that are ready to compute." *Id.* at 9:42-43. This architecture creates improvements to the functioning of computer systems utilizing the invention.

59.     For example, the '425 Patent allows the system to "introduce new transformation pipelines just as they are needed, creating only those that are ready to compute" in order to compensate for the "exponential growth of resource consumption" that may arise in streaming data systems. *Id.* at 9:35-44. This enables the system to operate "in a timely and efficient manner" by providing "the ability to monitor for both operational issues within its components," "to learn and react to intermediate determinations of the analyses it runs," and "self-modify to maintain optimal operation." *Id.* at 4:49-54.

60.     The claims of the '425 Patent thus cover specific solutions that provide specific technological advantages to data processing systems. For example, they claim unconventional distributed architectures that enable smart scaling, which closely matches resource usage to

resource needs even with unpredictable streaming data inputs, making the overall system more efficient. They allow the system to scale both up and down dynamically, an inherently difficult problem. For example, scaling down is a significant challenge due to the need to handle data processing that is "in flight" during the rescaling. The result is that these solutions can run in environments that periodically generate massive traffic, reducing average latency to acceptable limits. Those same systems can also scale down to smaller run-time environments, reducing total compute utilization. In the cloud era, this reduced utilization leads to directly reduced cost. Moreover, and as the specification explains, such streaming input feeds can include a wide variety of sources, including for example "the internet," "arrays of physical sensors," "database servers," "electronic monitoring equipment," and "direct human interaction." *Id.* at 15:37-42. As the processing of such streaming data can be "limited" by "the resources of the system," *id.* at 9:67-10:2, the scaling capabilities recited in the claims provide discrete and tangible improvements to data processing architectures by allowing the architecture to automatically enlist additional computing resources on an as-needed basis, distributing the increased compute load over multiple computer systems when necessary.

61.     As another example, the claimed distributed computational graph combines knowledge of the network architecture and data flow in a unique way that enables the system to be more adaptable, by, for example, replicating certain processing steps to remove bottlenecks in overall processing time. As another example, the specification explains that the claimed distributed computational graph allows the system to "monitor for data searches or transformations that are processing slowly or may have hung and for results that are outside established data stability boundaries so that actions can be implemented to resolve the issue," enabling both "autonomous[ ]" action by the system itself and "status updates . . . made by administrators" or "direct changes to operational parameters by such." *Id.* at 16:55-63. This

leads to improvements in the distribution of response latencies, both reducing average and worst-case latencies. The specification further explains that the claimed self-monitoring capabilities "enables steps to be taken and notifications to be passed if individual transformation nodes within a transformation pipeline become unresponsive during analysis operations." *Id.* at 23:29-33.

62.     Accordingly, the claims of the '425 Patent provide discrete technological solutions to challenges unique to computer systems, such as the necessity of dynamic and efficient resource allocation in a data processing environment that requires analysis of streaming data from a variety of potentially disparate input sources, and system self-monitoring and assessment to resolve stalled or unstable data processing in such an environment.

63.     The '425 Patent's improvements to very large data analysis systems are further described in the specification.

64.     PAN is not currently licensed to practice the '425 Patent.

65.     Qomplx is informed and believes, and thereon alleges, that PAN has infringed and continues to infringe one or more claims of the '425 Patent in violation of 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, directing an entity to use, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, PAN products that practice one of more claims of the '425 Patent, including without limitation products that incorporate, rely upon, interact with, or otherwise utilize SLS (the "Accused '425 Functionality").

66.     For example and without limitation, products that incorporate, rely upon, interact with, or otherwise utilize SLS, including at least PAN's AIOps for NGFW, Prisma Access, IoT Security, Panorama, Saas Security Inline, Cortex XDR, Cortex XSOAR, and

Cortex Xpanse (collectively, the "Accused SLS Products") embody every limitation of at least claim 1 of the '425 Patent, both literally and under the doctrine of equivalents, as set forth below. The further descriptions below, which are based on publicly available information, are preliminary examples and are non-limiting.

67.    Claim 1 of the '425 Patent provides:

A system comprising:
a distributed computing network comprising a first plurality of computer systems, a second plurality of computer systems, and a third plurality of computer systems,
wherein a first computer system of the first plurality of computer systems is configured to execute first software instructions that:
receive a first stream of input data,
process first portions of the first stream of data by applying a first transformation pipeline to the first portions of the first stream of data to generate first pipeline output messages, and
transmit the first pipeline output messages;
wherein a second computer system of the first plurality of computer systems is configured to execute second software instructions that:
process first portions of the first pipeline output messages by applying a second transformation pipeline to the first portions of the first pipeline output messages;
wherein a third computer system of the second plurality of computer systems comprises a memory that stores a first data,
wherein the first data represents a portion of a distributed computational graph,
and wherein the portion of the distributed computational graph describes a flow of data from the first transformation pipeline to an input of the second transformation pipeline;
wherein the third computer system is configured to execute third software instructions that:
process the first data to determine information about at least one of the first transformation pipeline and the second transformation pipeline,
monitor at least a portion of the execution of at least one of the first software instructions and the second software instructions in accordance with the determined information, and
in response to the monitoring, cause a fourth computer system of the third plurality of computer systems to execute fourth software instructions that perform at least one of:
processing second portions of the first stream of data by applying the first transformation pipeline to the second portions of the first stream of data, or
processing second portions of the first pipeline output messages by applying a second transformation pipeline to the second portions of the first pipeline output messages,

wherein the first computer system and the third computer system are distinct, and wherein the third computer system and the fourth computer system are distinct.

68.    By incorporating, relying upon, interacting with, or otherwise utilizing SLS, the Accused SLS Products meet every element of this claim. The further descriptions below, which are based on an analysis of publicly available information, are preliminary examples and non-limiting.

69.    For example, the Accused SLS Products form a distributed computing network comprising at least three pluralities of computer systems. Palo Alto Networks products run on a "large-scale data platform" on Google's massive distributed computing cluster.[14]

## The importance of self-managed streaming Infrastructure

We built a large-scale data platform on Google Cloud. We used Dataflow as a managed streaming service. With Dataflow, we used the streaming engine running our application using Apache Beam and observability tools such as Cloud Logging and Cloud Monitoring. For more details, see [1]. The system can handle 15 million of events per second and one trillion events daily, at four petabytes of data volume daily. We run about 30,000 Dataflow jobs. Each job can have one or hundreds of workers, depending on the customer's event throughputs.

SLS is based on Apache Beam ("Beam") for the entire platform.[15]

70.    On information and belief, the Accused SLS Products contain a first computer system of the first plurality of computer systems that is configured to execute first software instructions that receive a first stream of input data, process first portions of the first stream of data by applying a first transformation pipeline to the first portions of the first stream of data to generate first pipeline output messages, and transmit the first pipeline output messages. For example, SLS "us[es]" Beam to define and deploy pipelines into a distributed

---

[14] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[15] https://beam.apache.org/case-studies/paloalto/#background

environment.[16] Documentation shows tens of CPUs required for a single customer.[17] The cluster required to serve all of PAN's customers is much larger.



71.    On information and belief, the Accused SLS Products contain a second computer system of the first plurality of computer systems that is configured to execute second software instructions that process first portions of the first pipeline output messages by applying a second transformation pipeline to the first portions of the first pipeline output messages. For example, SLS uses a custom, distributed Beam Runner that receives a stream of input data and processes that data, including by running various complex Beam pipelines.[18] Apache documentation explains that "[a] Beam Runner runs a Beam pipeline on a specific (often distributed) data processing system."[19] For example, SLS uses a custom Beam Runner, which takes the Beam pipelines and distributes them across the network.[20]

72.    The Beam platform documentation demonstrates these pipeline input and output messages:[21]

---

[16] https://beam.apache.org/case-studies/paloalto/

[17] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[18] https://beam.apache.org/case-studies/paloalto/#background

[19] https://beam.apache.org/documentation/

[20] https://beam.apache.org/case-studies/paloalto/#background

[21] https://beam.apache.org/documentation/

In this diagram, the boxes represent the parallel computations called _PTransforms_ and the arrows with the circles represent the data (in the form of _PCollections_) that flows between the transforms. The data might be bounded, stored, data sets, or the data might also be unbounded streams of data. In Beam, most transforms apply equally to bounded and unbounded data.

You can express almost any computation that you can think of as a graph as a Beam pipeline. A Beam driver program typically starts by creating a `Pipeline` object, and then uses that object as the basis for creating the pipeline's data sets and its transforms.

73.    For example, the various PTransform steps receive pipeline messages, apply transformation pipelines, and send pipeline messages. PAN's Beam Runner, as discussed above, runs these pipelines across massive computational clusters

74.    On information and belief, the Accused SLS Products contain a third computer system of the second plurality of computer systems, which comprises a memory that stores a first data, wherein the first data represents a portion of a distributed computational graph, and wherein the portion of the distributed computational graph describes a flow of data from the first transformation pipeline to an input of the second transformation pipeline. For example, Beam uses a directed graph to define the structure and execution of operations. Respective portions of this directed graph are stored in the memory of various orchestration computers such as those that comprise the SLS custom Beam Runner.[22]

---

[22] https://beam.apache.org/documentation/basics/#pipeline

## Pipeline

A Beam pipeline is a graph (specifically, a underlined directed acyclic graph) of all the data and computations in your data processing task. This includes reading input data, transforming that data, and writing output data. A pipeline is constructed by a user in their SDK of choice. Then, the pipeline makes its way to the runner either through the SDK directly or through the Runner API's RPC interface. For example, this diagram shows a branching pipeline:



75.     For example, an SLS pipeline directly encodes nodes as transformations; the *PTransform* nodes describe both the transformation pipelines and the flow of data.[23]



76.     On information and belief, the third computer system of the Accused SLS Products executes third software instructions that process the first data to determine information about at least one of the first transformation pipeline and the second transformation pipeline, monitor at least a portion of the execution of at least one of the first software instructions and the second software instructions in accordance with the determined information, and in response to the monitoring, cause a fourth computer system of the third plurality of computer systems to execute fourth software instructions that perform at least one

---

[23] https://beam.apache.org/documentation/basics/#pipeline

of: processing second portions of the first stream of data by applying the first transformation pipeline to the second portions of the first stream of data, or processing second portions of the first pipeline output messages by applying a second transformation pipeline to the second portions of the first pipeline output messages, wherein the first computer system and the third computer system are distinct, and wherein the third computer system and the fourth computer system are distinct. For example, SLS uses a custom autoscaler that monitors various metrics about the execution of the transformation pipelines, including Beam backlog metrics.[24] The custom autoscaler scales resources up and down on an as-needed basis. When necessary, it scales up the number of task managers to "drain the lag and keep up with the throughput."[25] This scaling up involves causing an additional computer systems to apply transformation pipelines. And when necessary, it "scales down the minimum number of resources required to process the incoming traffic to reduce costs."[26]

77.     Accordingly, as illustrated above, the Accused SLS Products directly infringe one or more claims of the '425 Patent. PAN makes, uses, sells, offers for sale, and/or imports, in this District and/or elsewhere in the United States the Accused SLS Products and thus directly infringes the '425 Patent.

78.     Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '425 Patent, as provided in 35 U.S.C. § 271(b), including at least by inducing infringement by others, such as PAN's customers and end-users, in this District and elsewhere in the United States, to use the Accused SLS Products in manners that infringe the '425 Patent. PAN induces such direct

---

[24] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[25] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

[26] https://beam.apache.org/blog/apache-beam-flink-and-kubernetes/

infringement through its affirmative acts of making, using, directing an entity to use, selling, offering to sell, and/or importing the Accused SLS Products, as well as by advertising the Accused SLS Products and providing instructions, documentation, and other information to its customers and end-users to encourage and teach them how to use the infringing Accused SLS Products, including but not limited to by PAN providing in-store and online technical support, marketing materials, product manuals, advertisements, and other product documentation. At least after service of this Complaint, PAN performs these affirmative acts with knowledge of the '425 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '425 Patent.

79.     Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '425 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as PAN's customers and end-users, in this District and elsewhere in the United States. PAN's affirmative acts of selling and offering to sell the Accused SLS Products in this District and elsewhere in the United States, and causing the Accused SLS Products to be manufactured, used, sold, and offered for sale, contribute to PAN's customers and end-users using the Accused SLS Products, such that the '425 Patent is directly infringed. The accused components in the Accused SLS Products are material to the inventions claimed in the '425 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by PAN to be especially made or adapted for use in the infringement of the '425 Patent during at least the post-service period. Similarly, at least as of service of this Complaint, PAN performs these affirmative acts with knowledge of the '425 Patent and with the intent, or willful blindness, that they cause direct infringement of the '425 Patent.

80.     On information and belief, no licensed patent-practicing commercial products have been made, sold, offered for sale, or imported in a manner that would trigger the requirements of 35 U.S.C. § 287.

81.     PAN's infringement of the '425 Patent has damaged and will continue to damage Qomplx.

82.     Upon service of this complaint, PAN will have explicit written notice of its infringement of the '425 Patent. Nevertheless, on information and belief, PAN will, without authorization, knowingly, intentionally, purposefully, and deliberately continue to infringe the '425 Patent.

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 12,301,627

83.     Qomplx repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further alleges:

84.     The '627 Patent, entitled "Correlating Network Event Anomalies Using Active and Passive External Reconnaissance to Identify Attack Information," was duly and lawfully issued on May 13, 2025 and assigned to QOMPLX LLC. A true and correct copy of the '627 Patent is attached hereto as Exhibit 3.

85.     The '627 Patent names Jason Crabtree, Andrew Sellers, and Richard Kelley as inventors.

86.     The '627 Patent claims priority to, among others, U.S. Application No. 17/237,346, filed April 22, 2021.

87.     The '627 Patent has been in full force and effect since its issuance. Qomplx owns all rights to the '627 Patent that are necessary to bring this action.

88.    The '627 Patent, among other things, states that it "relates to the field of computer management, and more particularly to the field of cybersecurity and threat analytics." **Ex. 3** at 2:28-30.

89.    As the '627 Patent explains, "[u]nderstanding the cybersecurity profile of an organization is a complex endeavor, and" the complexity "increases exponentially with the size of the organization" because "each component of the organization's network connects to multiple other components." *Id.* at 2:34-39

90.    The '627 Patent further explains that prior art "cybersecurity rating methods (for example, the Common Vulnerability Scoring Systems, or CVSS) fail to adequately profile and rate the cybersecurity profiles of organizations because they do not incorporate sufficient information." *Id.* at 2:40-44.

91.    The '627 Patent overcomes the technological limitations of the prior art by providing "a system and method for correlating network event anomalies . . . that can identify attack patterns and points of origin based on observed anomalies and their relationships to other observed network events." *Id.* at 2:53-57.

92.    For example, Claim 1 of the '627 Patent describes a computer system that, among other things, represents a plurality of network entities and relationships as a directed graph, analyzes streaming data relating to one or more of those entities to identify an entity and a relationship that do not correspond to the plurality, updates the graph to account for that entity and relationship, identifies a potential attack path involving the entity by identifying additional entities that can be reached by using the first entity and generates a report identifying the first entity and an entity that can be reached by using the first entity. As the specification explains, this approach to network anomaly detection and response "describes the interconnectedness between nodes and the various event pathways that can occur,

including potential (or actual) attac[k] paths that an intruder may take advantage of when attempting to compromise the network or any particular nodes," allowing analysis of "what dependencies must be satisfied for any given event or node behavior, what the effects of the event or behavior are, what nodes are in turn affected by those outcomes, and other such directed flow information." *Id.* at 22:3-12. This, in turn, enables the system "to identify any possible event flows and interactions between the affected nodes, indicating causative effect pathways that are triggered by events and node behaviors, which in the case of an anomaly allows insight into what effects the anomaly may have or what may have led up to the event in question." *Id.* at 22:12-17.

93.    Accordingly, the systems claimed by the '627 Patent, including as described in Claim 1, represent discrete improvements in network security that "enable[] more effective mitigation of attacks and resolution of flaws in a network." *Id.* at 22:35-36. Unlike prior methods, which "focus on current symptoms of an attack," the architectures claimed by the '627 Patent allow computing systems to "directly identify and address the root cause of the issue." *Id.* at 22:40-42.

94.    For example, by representing on a directed graph a potential attack path involving an entity that could be involved in an attack on a network, the claims of the '627 Patent make it "possible to determine a point of origin for the anomaly and the starting conditions that were in place," which "enables more effective mitigation of attacks and resolution of flaws in a network, by identifying the precise causes of vulnerabilities and deficiencies so they may be addressed directly," improving on the prior art's "traditional approaches that are inherently limited to mitigating the outcomes of an unknown attack" and "focus on current symptoms of an attack." *Id.* at 22:33-44. As another example, by identifying the entities, such as accounts and resources, that can be reached by using the entity that may

be involved in an attack, the systems claimed in the '627 Patent can "analyze a user account and identify its access capabilities" such as "what files, directories, devices or domains an account may have access to," which "may be used to produce a 'blast radius' calculation" that "identif[ies] exactly what resources are at risk as a result of [an] intrusion and where security personnel should focus their attention." *Id.* at 23:17-27.

95.    Thus, by producing a "meaningful and contextualized visualization of a security infrastructure that reflects the current state of the internal relationships present in the infrastructure," the claims of the '627 Patent enable more efficient network defense and more efficient ways of using computers. *Id.* at 27:67-28:3. The '627 Patent claims a specific mechanism by which the computer system can store this contextualized representation of the security infrastructure inside an organization. This mechanism allows for a computer system to represent and continuously update a representation of a larger organization with reduced latency than prior art systems. The '627 Patent also claims a specific mechanism for simulating attacks within this representation. This mechanism allows for faster graph traversal, also allowing for the management of larger graphs with reduced latency. Each of these improvements to computer systems improve computer security by providing a more complete understanding of potential attack paths, their reach, and the consequences of any such attack, using a dynamic system map that is regularly updated rather than a static (and potentially outdated) understanding of the system.

96.    The '627 Patent's improvements to computer network defense systems are further described in the specification.

97.    PAN is not currently licensed to practice the '627 Patent.

98.    Qomplx is informed and believes, and thereon alleges, that PAN has infringed and continues to infringe one or more claims of the '627 Patent in violation of 35 U.S.C.

§ 271, either literally and/or under the doctrine of equivalents, by making, using, directing an entity to use, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, PAN products that practice one of more claims of the '627 Patent, including without limitation products that incorporate, rely upon, interact with, or otherwise utilize Infinity Graph (the "Accused '627 Functionality").

99.    For example and without limitation, products that incorporate, rely upon, interact with, or otherwise utilize the Accused '627 Functionality, including at least Infinity Graph, Prisma Cloud, and Cortex Cloud (collectively, the "Accused Security Products"), embody every limitation of at least claim 1 of the '627 Patent, both literally and under the doctrine of equivalents, as set forth below.

100.    Claim 1 of the '627 Patent provides:

A computer system comprising:
a hardware memory, wherein the computer system is configured to execute software instructions stored on nontransitory machine-readable storage media comprising software instructions that:
store in the hardware memory a representation of a first graph, wherein the representation of the first graph comprises representations of a first plurality of nodes corresponding to a first plurality of entities and further comprises representations of a first plurality of edges, wherein the first graph is a directed graph,
wherein the first plurality of entities comprises a plurality of accounts and a plurality of resources, and
wherein each edge of the first plurality of edges corresponds to a respective relationship between a respective pair of entities;
receive streaming data comprising time-stamped data about events relating to one or more entities of the first plurality of entities,
based on a first portion of the streaming data, identify a first entity that does not correspond to any of the first plurality of nodes, wherein the first entity is not of the first plurality of entities,
based on a second portion of the streaming data, wherein the second portion is not identical to the first portion, identify a first relationship between a pair of entities of the first plurality of entities that does not correspond to any of the first plurality of edges,
modify, in the hardware memory, the representation of the first graph to generate a modified representation of the first graph, wherein the modified representation of the first graph comprises a representation of a first node corresponding to the first entity and a representation of a first edge corresponding to the first relationship,

wherein the first node is not of the first plurality of nodes and the first edge is not of the first plurality of edges,

identify, based on the modified representation of the first graph, an attack path that could be involved in an attack involving the first entity, wherein identifying the attack path comprises:

identifying a second entity that can be reached using the first entity, wherein the second entity corresponds to a second node, and the second node is related by one or more edges to the first node corresponding to the first entity in the modified representation of the first graph; and,

identifying a third entity that can be reached using the second entity, wherein the third entity corresponds to a third node, and the third node is related by one or more edges to the second node in the modified representation of the first graph; and

generate a report comprising an identification of the first entity and at least one of the second entity and the third entity.

101.    By incorporating, relying upon, interacting with, or otherwise utilizing the Accused '627 Functionality, the Accused Security Products meet every element of this claim. The further descriptions below, which are based on an analysis of publicly available information, are preliminary examples and non-limiting.

102.    For example, and to the extent that the preamble is limiting, the Accused Security Products are computer systems.

103.    On information and belief, the Accused '627 Products execute software instructions that store in the hardware memory a representation of a first graph, wherein the representation of the first graph comprises representations of a first plurality of nodes corresponding to a first plurality of entities and further comprises representations of a first plurality of edges, wherein the first graph is a directed graph. For example, Infinity Graph

uses Amazon Neptune Database ("Neptune") to maintain a graph,[27] which is stored as a directed (subject/predicate) graph.[28]



104.    On information and belief, the Accused '627 Products execute software instructions wherein a first plurality of entities comprises a plurality of accounts and a plurality of resources. For example, PAN documentation shows examples of displayed output of Infinity Graph with various types of nodes including hosts (EC2 instances, "PrimaryAsset"), roles and their connections.[29] The EC2 roles are "credentials" in the EC2 system.[30]

---

[27] https://aws.amazon.com/blogs/database/how-prisma-cloud-built-infinity-graph-using-amazon-neptune-and-amazon-opensearch-service/

[28] https://docs.aws.amazon.com/neptune/latest/userguide/feature-overview-data-model.html

[29] https://www.paloaltonetworks.com/blog/prisma-cloud/infinity-graph-search-investigate/

[30] https://docs.aws.amazon.com/IAM/latest/UserGuide/id_roles_use_switch-role-ec2.html



105.    On information and belief, the Accused '627 Products execute software instructions wherein each edge of the first plurality of edges corresponds to a respective relationship between a respective pair of entities. For example, Prisma Cloud keeps track of different "relationship values" for different assets, corresponding to edge types.[31]



106.    On information and belief, the Accused '627 Products execute software instructions that receive streaming data comprising updates about events relating to entities of the first plurality, and use portions of that data to identify and modify the graph. For example,

---

[31] https://aws.amazon.com/blogs/database/how-prisma-cloud-built-infinity-graph-using-amazon-neptune-and-amazon-opensearch-service/

Prisma Cloud maintains a graph using a stream of "updates." On information and belief, these updates are time-stamped.[32] As another example, Infinity Graph uses a mutable graph, meaning that it updates the graph in place.[33]

107.    On information and belief, the Accused '627 Products execute software instructions that identify, based on the modified representation of the first graph, an attack path that could be involved in an attack involving the first entity. For example, PAN documentation shows that Infinity Graph includes a set of pre-defined analyses, which search the graph for paths, including a "list of AWS EC2 instances that are publicly exposed and are connected to remote systems known for suspicious domain request activities, and have critical or high vulnerabilities."[34]

108.    On information and belief, the Accused '627 Products execute software instructions wherein the second entity corresponds to a second node, and the second node is related by one or more edges to the first node corresponding to the first entity in the modified representation of the first graph. For example, PAN documentation shows such entities and relations in the screenshot of an exemplary infringing system below. The screenshot shows one or more "remote systems," at least one EC2 instance,[35] and vulnerabilities allowing a potential attacker to reach protected systems.

---

[32] https://aws.amazon.com/blogs/database/how-prisma-cloud-built-infinity-graph-using-amazon-neptune-and-amazon-opensearch-service/.

[33] https://aws.amazon.com/blogs/database/how-prisma-cloud-built-infinity-graph-using-amazon-neptune-and-amazon-opensearch-service/.

[34] https://www.paloaltonetworks.com/blog/prisma-cloud/infinity-graph-search-investigate/

[35] *Id.*



109.    On information and belief, the Accused '627 Products execute software instructions that identify a third entity that can be reached using the second entity, wherein that third entity corresponds to a third node, which is related by one or more edges to the second node in the modified representation of the first graph. Similarly,  the screenshot shows reachability access to further asserts such as AWS S3 storage.



110.    On information and belief, the Accused '627 Products execute software instructions that generate reports identifying the first entity and at least one of the second and third entities. For example, PAN documentation shows that the platform generates "path

highlights", showing specific "attack paths" by which one or more of the remote systems can reach second and third entities.[36] As another example, PAN documentation shows that these searches can be saved to generate "alerts."[37]

**Attack Path Analysis**

In a landscape where threats can emerge from multiple vectors, attack path analysis delivering an understanding of potential pathways of attack is key to getting out ahead of threats.

With Prisma Cloud's Infinity Graph and unified environment, users can search for assets and attach attack path vectors to them. In a single query, you can identify an internet-exposed EC2 instance, having overly permissive access, and possessing critical vulnerabilities.

The Infinity Graph allows users to pivot their queries, adding layers of security context. If a common issue emerges, users can set it as a policy, ensuring they receive alerts and can conduct regular scans. This approach ensures that security teams can identify and mitigate threats before they escalate.

111.    Accordingly, as illustrated above, the Accused Security Products directly infringe one or more claims of the '627 Patent. PAN makes, uses, sells, offers for sale, and/or imports, in this District and/or elsewhere in the United States the Accused Security Products and thus directly infringes the '627 Patent.

112.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '627 Patent, as provided in 35 U.S.C. § 271(b), including at least by inducing infringement by others, such as PAN's customers and end-users, in this District and elsewhere in the United States, to use the Accused Security Products in manners that infringe the '627 Patent. PAN induces such direct infringement through its affirmative acts of making, using, directing an entity to use, selling, offering to sell, and/or importing the Accused Security Products, as well as by advertising the

---

[36] https://www.paloaltonetworks.com/blog/prisma-cloud/infinity-graph-search-investigate/

[37] https://www.paloaltonetworks.com/blog/prisma-cloud/infinity-graph-search-investigate/

Accused Security Products and providing instructions, documentation, and other information to its customers and end-users to encourage and teach them how to use the infringing Accused Security Products, including but not limited to by PAN providing in-store and online technical support, marketing materials, product manuals, advertisements, and other product documentation. At least after service of this Complaint, PAN performs these affirmative acts with knowledge of the '627 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '627 Patent.

113.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '627 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as PAN's customers and end-users, in this District and elsewhere in the United States. PAN's affirmative acts of selling and offering to sell the Accused Security Products in this District and elsewhere in the United States, and causing the Accused Security Products to be manufactured, used, sold, and offered for sale, contribute to PAN's customers and end-users using the Accused Security Products, such that the '627 Patent is directly infringed. The accused components in the Accused Security Products are material to the inventions claimed in the '627 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by PAN to be especially made or adapted for use in the infringement of the '627 Patent during at least the post-service period. Similarly, at least as of service of this Complaint, PAN performs these affirmative acts with knowledge of the '627 Patent and with the intent, or willful blindness, that they cause direct infringement of the '627 Patent.

114.    On information and belief, no licensed patent-practicing commercial products have been made, sold, offered for sale, or imported in a manner that would trigger the requirements of 35 U.S.C. § 287.

115.    PAN's infringement of the '627 Patent has damaged and will continue to damage Qomplx.

116.    Upon service of this complaint, PAN will have explicit written notice of its infringement of the '627 Patent. Nevertheless, on information and belief, PAN will, without authorization, knowingly, intentionally, purposefully, and deliberately continue to infringe the '627 Patent.

## COUNT IV

### INFRINGEMENT OF U.S. PATENT NO. 11,539,663

117.    Qomplx repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further alleges:

118.    The '663 Patent, entitled "System and Method for Midserver Facilitation of Long-Haul Transport of Telemetry for Cloud-Based Services," was duly and lawfully issued on December 27, 2022 and assigned to Qomplx, Inc. A true and correct copy of the '663 Patent is attached hereto as Exhibit 4.

119.    The '663 Patent names Mika Chasman, Jeffrey Chung, Jason Crabtree, Luka Jurukovski, Richard Kelley, Artem Panasenkov, and Andrew Sellers as inventors.

120.    The '663 Patent claims priority to, among others, U.S. Application No. 15/141,752, filed April 28, 2016, and U.S. Provisional No. 62/568,291, filed October 4, 2017.

121.    The '663 Patent has been in full force and effect since its issuance. Qomplx owns all rights to the '663 Patent that are necessary to bring this action.

122.    The '663 Patent, among other things, states that it "relates to the field of computer technology, more specifically to the field of computer architectures for enterprise data collection, analysis, and transmission to cloud-based services." **Ex. 4** at 7:5-8.

123.    As the '663 Patent explains, there were "numerous problems" with "heterogeneous data transfer between cloud services and large offices or campuses for organizations," including a "lack of reliable data collection methods, poor standardized support for connection-oriented protocols by network appliances, security concerns with unfiltered or poorly filtered data, and bandwidth concerns with constantly streaming data which may result in network slowdown due to unprioritized data transfer." *Id.* at 7:23-31. For "larger business enterprises" with "thousands of computing devices sending data to a cloud-based service on separate connections," each connection represented "an additional security risk." *Id.* at 7:31-34.

124.    At the time of the invention, "data collection and models [did] not scale well for adding new data sources and flexible adhoc queries." *Id.* at 7:34-36. This resulted in "too much data being passed, no context for data and data sources oftentimes, unqueryable data and data sources, [an] inability to flexibly and quickly add new data sources such as new devices or user accounts which generate new data for analysis, and log management and data storage becom[ing] expensive and disorganized." *Id.* at 7:36-42.

125.    The '663 Patent overcomes the technological problems in the prior art by proposing "a system and method that uses midservers integrated with the business enterprise computer infrastructure and the cloud-based infrastructure to collect, aggregate, analyze, transform, and securely transmit data from a multitude of computing devices and peripherals at an external network to a cloud-based service." *Id.* at 7:61-66.

126.    The inventions claimed in the '663 Patent improve computer technology by "aggregating data at midservers," allowing "multiple connections [to] be presented over the network as a single secure connection to enterprise cloud-based systems" *Id*. at 9:49-51. The specific configurations claimed by the '663 Patent enable "[t]housands of connections" from a large enterprise to be "reduced to a single connection or a small number of connections." *Id*. at 9:52-54.

127.    "Midserver architecture also solves the problem that not all devices support secure data transport." *Id*. at 9:60-61. "In order to support system log traffic the data must be wrapped in a secure protocol before leaving the network." *Id*. at 9:63-65. The architecture claimed by the '663 Patent "can provide this type of capability by collecting and wrapping the data before it leaves the network." *Id*. at 9:65-67. The architectures claimed by the '663 Patent thus create improvements to the functioning of computer systems utilizing the invention.

128.    For example, Claim 1 of the '663 Patent describes a system for ingesting data into a cloud service from an external network, wherein among other things a midserver automatically installs a virtual appliance software application configured to load stored configurations on the midserver, establishes a secure network connection to an external network, receives data over a local network, transforms at least a portion of the received data and retransmits the received data over the secure network connection to the external network as a single data stream. The specification explains that the claimed midserver architecture, by receiving data over a local network and transforming at least a portion of that received data at the midserver, "allows for large-scale, reliable ingestion (i.e., one or more of collection, aggregating, analysis (pre-processing), transformation (pre-processing), and secure transmission) of data into a cloud-based service from an external network," which in turn "improves data consistency, reliability efficiency of bandwidth usage, and security." *Id*. at

11:22-28. For example, the claimed systems have direct reductions on the peak bandwidth that will be consumed by a network using such a system, which directly reduces costs.

129.    As another example, by establishing a secure network connection and transmitting data as a single data stream over that connection, the system described in Claim 1 of the '663 Patent uses "the midserver as a gateway to the cloud-based service," which "dramatically reduces the number of connections at the business enterprise's network edge, greatly reducing the number of avenues of attack and improving network security." *Id.* at 11:28-32. It also makes it easier to ensure that the number of *unencrypted* flows to the cloud-based service is zero. Many network attacks are based on finding a single unsecured endpoint inside an enterprise to exploit. The claimed systems prevent these attacks and improve computer security by isolating the entire class of third-party event-generating endpoints behind the single, secure midserver.

130.    The '663 Patent's improvements to computer architectures for enterprise data collection, analysis, and transmission to cloud-based services are further described in the specification.

131.    PAN is not currently licensed to practice the '663 Patent.

132.    Qomplx is informed and believes, and thereon alleges, that PAN has infringed and continues to infringe one or more claims of the '663 Patent in violation of 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, directing an entity to use, selling, and/or offering for sale in the United States, and/or importing into the United States, without authorization, PAN products that practice one of more claims of the '663 Patent, including without limitation products that incorporate, rely upon, interact with, or otherwise utilize Broker Virtual Machine ("Broker" or the "Accused '663 Functionality").

133.    For example and without limitation, products that incorporate, rely upon, interact with, or otherwise utilize Broker (collectively, the "Accused Broker Products") embody every limitation of at least claim 1 of the '663 Patent, both literally and under the doctrine of equivalents, as set forth below.

134.    Claim 1 of the '663 Patent provides:

A system for ingestion of data into a cloud-based service from an external network, comprising:
a midserver comprising at least a processor, a memory, and a plurality of programming instructions stored in the memory and operating on the processor, wherein the plurality of programming instructions, when operating on the processor, cause the processor to:
automatically install a virtual appliance software application, the virtual appliance software application configured to automatically load a plurality of stored configurations on the midserver;
establish a secure network connection to an external network;
receive data over a local network from a plurality of computing devices;
apply a plurality of transformations to at least a portion of the received data; and
retransmit the received data over the secure connection as a single data stream.

135.    By incorporating, relying upon, interacting with, or otherwise utilizing the Accused '663 Functionality, the Accused Broker Products meet every element of this claim. The further descriptions below, which are based on an analysis of publicly available information, are preliminary examples and non-limiting.

136.    For example, and to the extent that the preamble is limiting, the Accused Broker Products are systems for ingestion of log data into a cloud-based service from an external network. For example, PAN documentation explains that Broker is a system for ingestion of log data into a cloud-based service.[38]

---

[38] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/What-is-the-Broker-VM



137.    On information and belief, the Accused Broker Products include a midserver with a processor, a memory, and a plurality of programming instructions stored in the memory and operating on the processor. For example, PAN documentation explains that Broker is a virtual machine. The virtual machine runs on physical hardware and requires at least a processor and a memory to set up and run.[39]

### Hardware

For standard installation, use a minimum of a 4-core processor, 8 GB RAM, and 512 GB disk.

- If you only intend to use the Broker VM for the agent proxy, you can use a 2-core processor.
- If you intend to use the Broker VM for the agent installer and content caching, you must use a minimum of an 8-core processor and increase the disk space allocated for data storage to 1024 GB. For more information, see Increase Broker VM storage allocated for data caching.

138.    On information and belief, the Accused Broker Products contain programming instructions that cause the processor to automatically install a virtual appliance software application. For example, PAN documentation explains that Broker "automatically receives updates and enhancements from Cortex XDR, providing you with new capabilities without having to install a new VM or manually update the existing VM."[40]

---

[39] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/What-is-the-Broker-VM (listing requirements to set up Broker)

[40] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/What-is-the-Broker-VM

139.    On information and belief, the virtual appliance software application is configured to automatically load a plurality of stored configurations on the midserver. For example, Broker is configured from the XDR console, a cloud environment, resulting in configurations being loaded from the XDR console to the Broker.[41]

140.    On information and belief, the Accused Broker Products contain programming instructions that cause the processor to establish a secure network connection to an external network. For example, PAN documentation explains that Broker uses the Secure Sockets Layer ("SSL") security protocol to establish a secure network connection to the cloud.[42]

141.    On information and belief, the Accused Broker Products contain programming instructions that cause the processor to receive data over a local network from a plurality of computing devices, apply a plurality of transformations to at least a portion of the received data, and retransmit the received data over the secure connection as a single data stream. For example, PAN documentation explains that Broker receives logs from multiple endpoints,[43] applies a plurality of transformations to at least a portion of the received data and/or caches data for upload,[44] and retransmits the data over the secure connection in a single data stream.[45]

142.    Accordingly, as illustrated above, the Accused Broker Products directly infringe one or more claims of the '663 Patent. PAN makes, uses, sells, offers for sale, and/or

---

[41] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/Manage-Broker-VM

[42] https://docs-cortex.paloaltonetworks.com/r/Cortex-XSIAM/Cortex-XSIAM-Documentation/Set-up-and-configure-Broker-VM

[43] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/What-is-the-Broker-VM

[44] https://docs-cortex.paloaltonetworks.com/r/Cortex-XDR/Cortex-XDR-Documentation/Edit-Broker-VM-Configuration

[45] https://docs-cortex.paloaltonetworks.com/r/Cortex-XSIAM/Cortex-XSIAM-Documentation/Set-up-and-configure-Broker-VM

imports, in this District and/or elsewhere in the United States the Accused Broker Products and thus directly infringes the '663 Patent.

143.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '663 Patent, as provided in 35 U.S.C. § 271(b), including at least by inducing infringement by others, such as PAN's customers and end-users, in this District and elsewhere in the United States, to use the Accused Broker Products in manners that infringe the '663 Patent. PAN induces such direct infringement through its affirmative acts of making, using, directing an entity to use, selling, offering to sell, and/or importing the Accused Broker Products, as well as by advertising the Accused Broker Products and providing instructions, documentation, software, and other information to its customers and end-users to encourage and teach them how to use the infringing Accused Broker Products, including but not limited to by PAN providing in-store and online technical support, marketing materials, product manuals, advertisements, and other product documentation. At least after service of this Complaint, PAN performs these affirmative acts with knowledge of the '663 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '663 Patent.

144.    Additionally, and/or in the alternative, on information and belief, PAN has also indirectly infringed and continues to indirectly infringe the '663 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement committed by others, such as PAN's customers and end-users, in this District and elsewhere in the United States. PAN's affirmative acts of selling and offering to sell the Accused Broker Products in this District and elsewhere in the United States, and causing the Accused Broker Products to be manufactured, used, sold, and offered for sale, contribute to PAN's customers and end-users using the Accused Broker Products, such that the '663 Patent is directly infringed. The accused

components in the Accused Broker Products are material to the inventions claimed in the '663 Patent, are not staple articles or commodities of commerce, have no substantial non-infringing uses, and are known by PAN to be especially made or adapted for use in the infringement of the '663 Patent during at least the post-service period. Similarly, at least as of service of this Complaint, PAN performs these affirmative acts with knowledge of the '663 Patent and with the intent, or willful blindness, that they cause direct infringement of the '663 Patent.

145.    PAN's infringement of the '663 Patent has damaged and will continue to damage Qomplx.

146.    Upon service of this complaint, PAN will have explicit written notice of its infringement of the '663 Patent. Nevertheless, on information and belief, PAN will, without authorization, knowingly, intentionally, purposefully, and deliberately continue to infringe the '663 Patent.

**PRAYER FOR RELIEF**

WHEREFORE, Qomplx respectfully requests relief against Defendant PAN as follows:

A.    A judgment declaring that PAN has infringed, either literally and/or under the doctrine of equivalents, one or more claims of each of the Asserted Patents;

B.    An order and judgment enjoining PAN and its officers, directors, agents, employees, affiliates, attorneys, and all others acting in privity or in concert with it, and their subsidiaries, divisions, successors and assigns, from further acts of infringement of the Asserted Patents, or in the alternative, an ongoing royalty for all further acts of infringement;

C.    A judgment awarding Qomplx all damages adequate to compensate for PAN's infringement of the Asserted Patents, including, but not limited to, lost profits,

and in no event less than a reasonable royalty for PAN's acts of infringement, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.    An order awarding Qomplx supplemental damages, including interest, with an accounting, as needed;

E.    Costs of suit and reasonable attorneys' fees; and

F.    Any other remedy to which Qomplx may be entitled, including under any other law, that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Qomplx hereby demands a jury trial on all issues so triable.

Date: August 28, 2025

Respectfully Submitted,

*/s/ Claire Abernathy Henry*

Alan J. Heinrich
Ian R. Washburn
Amy E. Proctor
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
t: +1.310.203.7961
f: +1.310.203.7199
aheinrich@irell.com
iwashburn@irell.com
aproctor@irell.com

Claire A. Henry
Texas Bar No. 24053063
claire@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400

ATTORNEYS FOR PLAINTIFF